HARRIS & RUBLE
Alan Harris (SBN 146079)
Matthew E Kavanaugh (SBN 239961)
5455 Wilshire Boulevard, Suite 1800
Los Angeles, CA 90036
Tel: 323.931.3777
Fax: 323.931.3366
aharris@harrusandruble.com
mkavanaugh@harrisandruble.com
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BART BARBER, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>  vs.<br><br>HUMAN CONTRACT, LLC, OVERBROOK ENTERTAINMENT, LLC and DOE ONE through and including DOE TEN,<br><br>              Defendants. | Case No. CV09-00964 VBF (AJWx)<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT HUMAN CONTRACT, LLC'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS**<br><br>Date:        June 14, 2010<br>Time:       1:30 P.M.<br>Place:      312 N. Spring Street<br>              Courtroom 9<br>              Los Angeles, CA 90012<br><br>Assigned for all purposes to the Honorable Valerie Baker Fairbank<br>*Courtroom 9* |

Plaintiffs respectfully submit this statement of genuine issues pursuant to Central District of California Local Rule 56-2 in opposition to the motion for summary judgment herein filed by Defendant Overbrook Entertainment, LLC.

Facts 1 through 18 below correspond to the facts and supporting evidence presented in the Separate Statement of Uncontroverted Facts filed by the moving party, and Plaintiffs' response to these facts. Those facts are followed by additional material facts presented by Plaintiffs.

## <u>ISSUE NO. 1</u>: Labor Code § 203

| <u>DEF'S UNCONTROVERTED FACTS</u> | <u>DEF'S EVIDENCE</u> | <u>PLAINTIFFS' RESPONSE</u> |
|---|---|---|
| 1. Defendant HC employed Plaintiffs in the production of a motion picture entitled *The Human Contract.* | Complaint ¶¶ 2, 7. | Undisputed. |
| 2. Plaintiffs signed written employment agreements with HC which provided: "Wages shall be paid no later than Producer's first regular pay day following the week in which services were performed." | Ex. 4, ¶ 3; Ex. 5, ¶ 3. | Disputed on evidentiary grounds. |
| 3. HC contracted with a payroll company to provide payroll services. | Ex. 1, p. 21:6-9; Ex. 2, p. 59:16-23; Ex. 12. | Disputed on evidentiary grounds. |
| 4. The official name of the payroll company was Pav Film Services, Inc., an affiliate of Axium International, Inc. | Ex. A to RFJN, at p. 6; Ex. 12. | Undisputed. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| | | |
|---|---|---|
| 7. HC provided payroll funds to Axium before each payroll period and Axium cut checks to the employees. | Ex. 1, p. 92:2-93:1; Ex. 2, p. 61:10-14; Ex. 12, ¶ 6. | Disputed on evidentiary grounds. |
| 10. Production of the film ended in or around late December 2007. | Ex. 1, p. 22:7-16. | Undisputed. |
| 11. Final paychecks for the crew – including Plaintiffs – were either mailed to the employee or, at the employee's request, available for pickup at the production offices. | Gillam Decl., ¶ 2; Sulier Decl., ¶¶ 2, 3. | Disputed on evidentiary grounds. |
| 12. On January 8, 2008, after the production had finished shooting, Axium filed for bankruptcy. As a result, any uncashed paychecks at the time were no longer good. | Ex. 1, pp. 21:13-16; Ex. 2, pp. 60:4-61:19, Exs. A and B to Request for Judicial Notice. | Undisputed. |
| 13. Some employees' paychecks bounced. | Ex. 1, p. 94:17-22; Ex. 2, pp. 60:11-61:9, 61:15-19. | Undisputed. |
| 14. Some employees' paychecks initially appeared to have cleared and, as many as 10 business days later, the bank notified the employees that the checks had bounced. | Ex. 1, pp. 17:24-18:15. | Undisputed. |

| | | |
|---|---|---|
| 15. Following Axium's bankruptcy, HC resolved to pay these employees a second time. But before doing so, it had to determine which of the cast and crew had checks that bounced or needed replacing. | Ex. 1, pp. 17:17-23; 95:20- 96:8. | Disputed on evidentiary grounds. Plaintiffs were not paid until on or after February 19, 2008. No Plaintiff was "paid a second time." It was unnecessary for HC to take any action "to determine which of the cast and crew had checks that bounced or needed replacing ," since each Plaintiff informed HC of the problem, as did PAV. |
| 16. HC e-mailed the cast and crew and asked anyone who had not deposited their check in time to have their bank fax or e-mail to HC a confirmation that the check was no longer valid. | Ex. 14. | Disputed on evidentiary grounds. There is only evidence that Dave Buehrle received that email. Def. Ex. 14. |
| 17. All cast and crew members who had not deposited their checks in time (including each of Plaintiffs), received a valid replacement check. | Ex. 2, p. 78:20- 24; Ex. 7; Gillam Decl., ¶ 4. | Disputed on evidentiary grounds. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

## ISSUE NO. 2: Labor Code § 1194.

| DEF'S UNCONTROVERTED FACTS | DEF'S EVIDENCE | PLAINTIFFS' RESPONSE |
|---|---|---|
| 1. Defendant HC employed Plaintiffs in the production of a motion picture entitled *The Human Contract.* | Complaint ¶¶ 2, 7. | Undisputed. |
| 2. Plaintiffs signed written employment agreements with HC which provided: "Wages shall be paid no later than Producer's first regular pay day following the week in which services were performed." | Ex. 4, ¶ 3; Ex. 5, ¶ 3. | Disputed on evidentiary grounds. |
| 3. HC contracted with a payroll company to provide payroll services. | Ex. 1, p. 21:6-9; Ex. 2, p. 59:16-23; Ex. 12. | Disputed on evidentiary grounds. |
| 4. The official name of the payroll company was Pav Film Services, Inc., an affiliate of Axium International, Inc. | Ex. A to RFJN, at p. 6; Ex. 12. | Undisputed. |
| 7. HC provided payroll funds to Axium before each payroll period and Axium cut checks to the employees. | Ex. 1, p. 92:2-93:1; Ex. 2, p. 61:10-14; Ex. 12, ¶ 6. | Disputed on evidentiary grounds. |
| 10. Production of the film ended in or around late December 2007. | Ex. 1, p. 22:7-16. | Undisputed. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| | | |
|---|---|---|
| 11. Final paychecks for the crew – including Plaintiffs – were either mailed to the employee or, at the employee's request, available for pickup at the production offices. | Gillam Decl., ¶ 2; Sulier Decl., ¶¶ 2, 3. | Disputed on evidentiary grounds. |
| 12. On January 8, 2008, after the production had finished shooting, Axium filed for bankruptcy. As a result, any uncashed paychecks at the time were no longer good. | Ex. 1, pp. 21:13-16; Ex. 2, pp. 60:4-61:19, Exs. A and B to Request for Judicial Notice. | Undisputed. |
| 13. Some employees' paychecks bounced. | Ex. 1, p. 94:17-22; Ex. 2, pp. 60:11-61:9, 61:15-19. | Undisputed. |
| 14. Some employees' paychecks initially appeared to have cleared and, as many as 10 business days later, the bank notified the employees that the checks had bounced. | Ex. 1, pp. 17:24-18:15. | Undisputed. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| | | |
|---|---|---|
| 15. Following Axium's bankruptcy, HC resolved to pay these employees a second time. But before doing so, it had to determine which of the cast and crew had checks that bounced or needed replacing. | Ex. 1, pp. 17:17-23; 95:20- 96:8. | Disputed on evidentiary grounds. 1) Plaintiffs were each only paid their wages one time in late February 2008. Pl. Ex. 25. 2) Also, on January 10, 2008, PAV was well aware of the identify of all individuals whose checks did not clear. PAV forwarded this information to HCL no later than January 25, 2008, having advised HCL of the information contained therein, Pl. Ex. 21, p. 6-10. |
| 16. HC e-mailed the cast and crew and asked anyone who had not deposited their check in time to have their bank fax or e-mail to HC a confirmation that the check was no longer valid. | Ex. 14. | Disputed on evidentiary grounds. There is only evidence that Dave Buehrle received any such email. Def. Ex. 14. |

| DEF'S UNCONTROVERTED FACTS | DEF'S EVIDENCE | PLAINTIFFS' RESPONSE |
|---|---|---|
| 17. <u>All</u> cast and crew members who had not deposited their checks in time (including each of Plaintiffs), received a valid replacement check. | Ex. 2, p. 78:20-24; Ex. 7; Gillam Decl., ¶ 4. | Disputed on evidentiary grounds.. |
| 18. Plaintiffs entered into a stipulation agreeing that their third, fourth, and fifth claims for relief were based solely on the allegation that Plaintiffs' wages were paid on time. | Ex. 15. | Undisputed. |

**ISSUE NO. 3:** **Fair Labor Standards Act, 29 U.S.C. §§ 206, 207**.

| DEF'S UNCONTROVERTED FACTS | DEF'S EVIDENCE | PLAINTIFFS' RESPONSE |
|---|---|---|
| 1. Defendant HC employed Plaintiffs in the production of a motion picture entitled *The Human Contract.* | Complaint ¶¶ 2, 7. | Undisputed. |
| 2. Plaintiffs signed written employment agreements with HC which provided: "Wages shall be paid no later than Producer's first regular pay day following the week in which services were performed." | Ex. 4, ¶ 3; Ex. 5, ¶ 3. | Disputed on evidentiary grounds. |
| 3. HC contracted with a payroll company to provide payroll services. | Ex. 1, p. 21:6-9; Ex. 2, p. 59:16-23; Ex. 12. | Disputed on evidentiary grounds. |

| | | |
|---|---|---|
| 4. The official name of the payroll company was Pav Film Services, Inc., an affiliate of Axium International, Inc. | Ex. A to RFJN, at p. 6; Ex. 12. | Undisputed. |
| 7. HC provided payroll funds to Axium before each payroll period and Axium cut checks to the employees. | Ex. 1, p. 92:2-93:1; Ex. 2, p. 61:10-14; Ex. 12, ¶ 6. | Disputed on evidentiary grounds. |
| 10. Production of the film ended in or around late December 2007. | Ex. 1, p. 22:7-16. | Undisputed. |
| 11. Final paychecks for the crew – including Plaintiffs – were either mailed to the employee or, at the employee's request, available for pickup at the production offices. | Gillam Decl., ¶ 2; Sulier Decl., ¶¶ 2, 3. | Disputed on evidentiary grounds. |
| 12. On January 8, 2008, after the production had finished shooting, Axium filed for bankruptcy.  As a result, any uncashed paychecks at the time were no longer good. | Ex. 1, pp. 21:13-16; Ex. 2, pp. 60:4-61:19, Exs. A and B to Request for Judicial Notice. | Undisputed. |
| 13. Some employees' paychecks bounced. | Ex. 1, p. 94:17-22; Ex. 2, pp. 60:11-61:9, 61:15-19. | Undisputed. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| 14. Some employees' paychecks initially appeared to have cleared and, as many as 10 business days later, the bank notified the employees that the checks had bounced. | Ex. 1, pp. 17:24-18:15. | Undisputed. |
| --- | --- | --- |
| 15. Following Axium's bankruptcy, HC resolved to pay these employees a second time. But before doing so, it had to determine which of the cast and crew had checks that bounced or needed replacing. | Ex. 1, pp. 17:17-23; 95:20- 96:8. | Disputed on evidentiary grounds. 1) Plaintiffs were each only paid their wages one time in late February 2008. Pl. Ex. 25. 2) Also, on January 10, 2008, PAV was well aware of the identify of all individuals whose checks did not clear. PAV forwarded this information to HCL no later than January 25, 2008, having advised HCL of the information contained therein, Plaintiffs' Ex. 21, p. 6-10. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| | | |
|---|---|---|
| 16. HC e-mailed the cast and crew and asked anyone who had not deposited their check in time to have their bank fax or e-mail to HC a confirmation that the check was no longer valid. | Ex. 14. | Disputed on evidentiary grounds. There is only evidence that Dave Buehrle received any such email. (Def. Ex. 14.) |
| 17. <u>All</u> cast and crew members who had not deposited their checks in time (including each of Plaintiffs), received a valid replacement check. | Ex. 2, p. 78:20-24; Ex. 7; Gillam Decl., ¶ 4. | Disputed on evidentiary grounds. |
| 18. Plaintiffs entered into a stipulation agreeing that their third, fourth, and fifth claims for relief were based solely on the allegation that Plaintiffs' wages were paid on time. | Ex. 15. | Undisputed. |

**ISSUE NO. 4:** Labor Code § 226(a).

| DEF'S UNCONTROVERTED FACTS | DEF'S EVIDENCE | PLAINTIFFS' RESPONSE |
|---|---|---|
| 1. Defendant HC employed Plaintiffs in the production of a motion picture entitled *The Human Contract.* | Complaint ¶¶ 2, 7. | Undisputed. |
| 3. HC contracted with a payroll company to provide payroll services. | Ex. 1, p. 21:6-9; Ex. 2, p. 59:16-23; Ex. 12. | Disputed on evidentiary grounds. |

| | | |
|---|---|---|
| 4. The official name of the payroll company was Pav Film Services, Inc., an affiliate of Axium International, Inc. | Ex. A to RFJN, at p. 6; Ex. 12. | Undisputed. |
| 5. Under the contract with Axium, HC engaged Axium "to exclusively supply the services of Crew and Talent in connection with the production of [*The Human Contract*]." | Ex. 12, p. HC0061. | Disputed on evidentiary grounds. |
| 6. Axium was "to employ people to perform services" and "supply the services of such people" to HC. | Ex. 12, ¶ 1.1, p. HC0061. | Disputed on evidentiary grounds. 1) There is no evidence in the record that Axium engaged in any employment of Plaintiffs. 2) Overbrook made a judicial admission that HCL was the "only" employer of Plaintiffs. 3) This Court has previously determined that a payroll company cannot be an employer. PUF 55. |
| 7. HC provided payroll funds to Axium before each payroll period and Axium cut checks to the employees. | Ex. 1, p. 92:2-93:1; Ex. 2, p. 61:10-14; Ex. 12, ¶ 6. | Disputed on evidentiary grounds. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| | | |
|---|---|---|
| 8. Those checks contained pay stubs which listed, among other information, the name of Axium's affiliate who had formally employed Plaintiffs, that affiliate's address, the applicable hourly rates paid to each such Plaintiff, and total hours worked by that Plaintiff during that pay period. | Ex. 6. | Disputed. Axium did not "formally employ[] Plaintiffs." The referenced document only identifies PAV as an employer for "unemployment" purposes. |
| 9. Plaintiffs each signed an "Employment Eligibility Verification," listing as their employers both Axium and HC. | Ex. 13. | Disputed on evidentiary grounds. 1) The Payroll Company cannot be an employer. PUF 52, 55/ 2) The "Employment Eligibility Verification" does not list Axium as an "employer." Def. Ex. 13. |

## Plaintiffs' Additional Uncontroverted Facts

Opposing party also contends that the following other material facts which are relevant to each cause of action:

### ISSUE NO. 1: Labor Code § 203

| Plaintiffs Additional Uncontroverted Facts | Plaintiff's Evidence |
|---|---|
| 19. Plaintiff Bart Barber and the Opt-In Collective Action Members are ten members of the crew who worked on the production of the motion picture *The Human Contract*. | Barber Decl., ¶ 2-3; Bernstein Decl., ¶ 2-3; Bracken Decl., ¶ 2-3; Buehrle Decl., ¶ 2-3; Davis Decl., ¶ 2-3; Goyer Decl., ¶ 2-3; Nisar Decl., ¶ 2-3; Turner Decl., ¶ 2-3; Wade Decl., ¶ 2-3; Wayton Decl., ¶ 2-3. |
| 20. Plaintiffs' claims arise out of the fact that none received his or her final wages for more than 50 days after being discharged, and were not provided proper wage statements. | Barber Decl., ¶ 6, 10; Bernstein Decl., ¶ 5-7; Bracken Decl., ¶ 6-8; Buehrle Decl., ¶ 6, 8; Davis Decl., ¶ 6, 9-10; Goyer Decl., ¶ 4-6; Nisar Decl., ¶ 5-8; Turner Decl., ¶ 4, 6; Wade Decl., ¶ 4, 6-8; Wayton Decl., ¶ 4, 6-8. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| | |
|---|---|
| 21.<br><br>All the crew on *The Human Contract* – including Plaintiffs – entered into written employment contracts with Human Contract LLC. | Pl. Ex. 19, 5:9-11. |
| 22.<br><br>Human Contract, LLC is the entity that entered Collective Bargaining Agreements ("CBA's") with various unions for the making of *The Human Contract*. | Pl. Ex. 19, 6:1 |
| 23.<br><br>Human Contract, LLC had the power to fire crewmembers. | Pl. Ex. 19, 6:4-6. |
| 24.<br><br>Plaintiffs were supervised by the line producer, the unit production manager, and department heads. | Pl. Ex. 19, 14:6-8. |
| 25.<br><br>The line producer, unit production manager, and department heads were all employees of Human Contract LLC. | Pl. Ex. 19, 14:6-8. |
| 26.<br><br>It was Human Contract, LLC that was responsible for day-to-day supervision of crew members such as Plaintiffs. | Pl. Ex. 19, 6:1 – 7:10. |
| 27.<br><br>It was Human Contract, LLC who had the power to fire crewmembers. | Pl. Ex. 19, 6:6. |
| 28. | Pl. Ex. 19, 8:18-23. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| | |
|---|---|
| The department heads, the first assistant director, the second assistant director, the crew, the unit production manager, and the line producer all had contractual employment agreements with Human Contract, LLC. | |
| 29.<br>Crew rate of pay was determined either by union contracts or by department heads in consultation with the line producer and UPN. | Pl. Ex. 19, 9:3-4. |
| 30.<br>The budget, which includes estimates for crew labor, was prepared by the line producer, unit production manager, and production accountant, all three of whom were employed by Human Contract, LLC. | Pl. Ex. 19, 9:7-9. |
| 31.<br>HCL was the Plaintiffs' "sole" employer. | Pl. Ex. 13, p. 5:12-18;<br>Pl. Ex. 19, 5:7-11. |
| 32.<br>Human Contract, LLC's production accountant, production legal department, and production coordinator (and then, after production was completed, the post-production accountant) maintained crew employment records, and many of those records were produced in discovery as Exhibits HC394-775. | Pl. Ex. 19, 9:14-17. |
| 33.<br>Human Contract, LLC is a limited liability company with two members, which was created to produce *The Human Contract*. | Pl. Ex. 19, 4:8-10. |
| 34.<br>PAV Film Services, Inc., was a payroll company | Pl. Ex. 19, 9:10-13;<br>Pl. Ex. 1-11. |

| | |
|---|---|
| chosen and utilized by Human Contract, LLC to process payroll for each of the Plaintiffs and other crewmembers on Production. | |
| 39. On February 1, 2008, Alison Cohen, Human Contract, LLC's production attorney, was sent an email from Film Finances, Inc., stating, in pertinent part that Human Contract, LLC should "determine[] their legal responsibility to repay [the employees] in light of the axium bankruptcy." | Pl. Ex., 21-04. |
| 40. On February 4, 2008, Human Contract, LLC communicated with Film Finances, Inc., the Production's bonding company, whether Human Contract, LLC might pay its employees from the 10% contingency funds that had already been put aside, or from some other source. | Pl. Ex., 21-01. |
| 41. On or before January 16, 2008, all Plaintiffs had notified a representative of Human Contract, LLC that their respective paychecks were not negotiable. | Barber Decl., ¶ 6; Bernstein Decl., ¶ 5; Bracken Decl., ¶ 6; Buehrle Decl., ¶ 6; Davis Decl., ¶ 6; Goyer Decl., ¶ 4; Nisar Decl., ¶ 5; Turner Decl., ¶ 4; Wade Decl., ¶ 4; Wayton Decl., ¶ 4. |
| 42. | Pl. Ex. 18, 2:19-24 |

| | |
|---|---|
| Human Contract, LLC claims that it did not immediately provide final payment of wages to Plaintiffs was due to the fact that, "there was no money in the film's budget to pay a second time wages of those employees who did not deposit their checks when they received them . . . [and] Human Contract, LLC needed to obtain approval from the bonding company to use the contingency to repay the wages a second time." | |
| 43. <br><br> Except for Jeffrey Goyer, each of the Plaintiffs deposited their nonnegotiable paychecks from PAV shortly after receipt, in early January 2008. | Barber Decl., ¶ 6; <br> Bernstein Decl., ¶ 5; <br> Bracken Decl., ¶ 6; <br> Buehrle Decl., ¶ 6; <br> Davis Decl., ¶ 6; <br> Nisar Decl., ¶ 5; <br> Turner Decl., ¶ 4; <br> Wade Decl., ¶ 4; <br> Wayton Decl., ¶ 4. |
| 44. <br><br> The checks each Plaintiff received in or about early January 2008, for the work they performed in December 2007 were nonnegotiable, and accordingly their payment of final wages remained outstanding until on or after February 19, 2008. | Barber Decl., ¶ 6; <br> Bernstein Decl., ¶ 5; <br> Bracken Decl., ¶ 6; <br> Buehrle Decl., ¶ 6; <br> Davis Decl., ¶ 6; <br> Nisar Decl., ¶ 5; <br> Turner Decl., ¶ 4; <br> Wade Decl., ¶ 4; <br> Wayton Decl., ¶ 4. |

| | |
|---|---|
| | Pl. Ex., 16-4:11-25. |
| 45.<br><br>Human Contract, LLC did not make payment of Plaintiffs' final wages available to them until February 19, 2008. | Pl. Ex., 16-4:11-25. |
| 47.<br><br>Those document which are included in Exhibits 1-12, 21, &22 to Plaintiff Evidence in Support of Motion for Summary Judgment, and are Bates stamped by HCL as HC0001-867, are true and accurate copies of documents produced by Human Contract, LLC in response to Requests for Production, propounded by Plaintiff Bart Barber in this action. | Pl. Ex. 1-12, 21, 22.<br>Harris Decl. ¶ ¶ 2, 6-7. |
| 49.<br><br>The paychecks HCL tendered in late February of 2008 to each of the Plaintiffs claim to be "invoices" to "vendors" and fail to provide any information regarding the "gross wages earned" (section 226(a)(1)); "total hours worked" (section 226(a)(2)); "all deductions" (section 226(a)(4)); "inclusive dates of the period for which the employee is paid" (section 226(a)(6)); four digits from a social security number or an employee identification number (section 226(a)(7)); or "all applicable hourly rates in effect . . . and the corresponding number of hours worked at each hourly rate" (section 226(a)(9)). | Pl. Ex. 12. |
| 50.<br><br>On January 25, 2008, Scott Trivigno, for PAV, | Pl. Ex. 21, pp. 06-10; |

provided to Dave Koplan, for HCL, "a listing of all checks for this project that have not been cleared by Bank of America," as of January 11, 2008. On February 1, 2008, Alison Cohen, acting for HC, wrote to the bonding company, Film Finances: "I understand that representatives of Film Finances have authorized Human Contract, LLC to re-pay the cast and crew of Human Contract whose checks bounced due to the Axium bankruptcy from our contingency." On February 1, 2008, Clay Steward, for Film Finances, responded to Alison Cohen: "I would say it is inaccurate to state that we have authorized production to 're-pay' the case and crew. Rather, this amount should be reserved until producers have determined their legal responsibility to repay in light of the axiom bankruptcy." Alison Cohen for HC responded to Clay Steward for Film Finances: "OK, so you don't want us to be writing checks? I think people at Film Finances are telling production to do it." Thereafter, Steve Ransohoff of Film Finances wrote to Alison Cohen for HC: "In the first instance, the decision of whether or not the company is required to make payment to the individual with bounced checks is a decision that has to be made by the company. . . . I have seen some correspondence about our authorizing that payments should or should not be made and this, as noted above, is really something for the producers to determine in the first instance." Alison Cohen

responded to Ransohoff: "We have all come to the conclusion that we are legally obligated to make these payments to our cast and crew a second time because we are the contracting party on all cast and crew agreements. Accordingly, our contingency is going to be pretty depleted. Does Film Finance approve of this expenditure . . . . We just want to make sure that in the event there are unsorseen overages in excess of the contingency that Film Finances will cover them." Steward responded on February 4, 2008: "If that is the production's decision, then FFI will support that . . . the bond speaks for itself . . ." On February 4, 2008, Cohen made one final inquiry of Film Finances, but the response, if any, has not been forthcoming in discovery: ". . . I don't deal in these matters on a regular basis, do you mind if I put this in plain/laypersons English? Specifically, Film Finances is saying that if Human Contract LLC elects to repay the bounced Axium checks, which Human Contract LLC may chose to do in it's sole discretion, that Film Finances consents thereto. This consent by Film Finances means that to the extent such payments deplete the contingency for the picture, Film Finances will nonetheless still cover future overages provides such overages are not due to 'elective-type' enhancements that were not in the original bonded budget for the picture. Please confirm by return email that this is correct." Many days passed before the

| | |
|---|---|
| crew was paid. | |
| 51.<br><br>Exhibit 24 to Plaintiffs Evidence is a true and accurate copy of an email sent on behalf of Human Contract, LLC on or about February 15, 2008, which was produced by HCL in discovery. | Harris Decl., ¶ 9;<br>Pl. Ex. 24. |
| 53.<br><br>Black's Law Dictionary defines "Payment" as "performance of an obligation by the delivery of money or some other valuable thing, accepted in partial or full discharge of the obligation . . . the money or other valuable thing so delivered in satisfaction of an obligation." | Pl. Ex. 25. |
| 54.<br><br>Black's Law Dictionary defines "Wages" as "payment for labor or services . . ." | Pl. Ex. 26. |
| 55.<br><br>This Court has previously determined that entertainment payroll companies like Axium are not an employer of crewmembers in the entertainment industry. | Harris Decl., ¶ 13-14.<br>Pl. Ex. 28-29. |
| 58.<br><br>On February 1, 2008, Alison Cohen, Human Contract, LLC's production attorney, was sent an email from Film Finances, Inc., stating, in pertinent part that Human Contract, LLC should "determine[] their legal responsibility to repay [the employees] in light of the axium bankruptcy." | Pl. Ex., 21-04. |

| | |
|---|---|
| 59.<br><br>On February 4, 2008, Film Finances, Inc., the Production's bonding company, opined that Human Contract LLC might pay its employees from the 10% contingency funds that had already been put aside, or from some other source. | Pl. Ex., 21-01. |
| 60.<br><br>Human Contract, LLC first learned, on or about January 8, 2008, that Axium had closed down. | Pl. Ex., 17, 2:10-22. |
| 61.<br><br>On or before January 16, 2008, all Plaintiffs had notified a representative of Human Contract, LLC that their respective paychecks were not negotiable. | Barber Decl., ¶ 6;<br>Bernstein Decl., ¶ 5;<br>Bracken Decl., ¶ 6;<br>Buehrle Decl., ¶ 6;<br>Davis Decl., ¶ 6;<br>Goyer Decl., ¶ 4;<br>Nisar Decl., ¶ 5;<br>Turner Decl., ¶ 4;<br>Wade Decl., ¶ 4;<br>Wayton Decl., ¶ 4. |
| 62.<br><br>Human Contract, LLC claims that it did not immediately provide final payment of wages to Plaintiffs was due to the fact that, "there was no money in the film's budget to pay a second time wages of those employees who did not deposit their checks when they received them . . . [and] Human Contract, LLC needed to obtain approval from the bonding company to use the contingency to repay the wages a | Pl. Ex. 18, 2:19-24 |

| | |
|---|---|
| second time." | |
| 63.<br><br>Except for Jeffrey Goyer, each of the Plaintiffs deposited their nonnegotiable paychecks from PAV shortly after receipt. | Barber Decl., ¶ 6;<br>Bernstein Decl., ¶ 5;<br>Bracken Decl., ¶ 6;<br>Buehrle Decl., ¶ 6;<br>Davis Decl., ¶ 6;<br>Nisar Decl., ¶ 5;<br>Turner Decl., ¶ 4;<br>Wade Decl., ¶ 4;<br>Wayton Decl., ¶ 4. |
| 64.<br><br>Human Contract, LLC did not make Plaintiffs' final wages available to them until February 19, 2008. | Pl. Ex., 16-4:11-25. |
| 66.<br><br>Those documents which are included in Exhibits 1-12, 21, &22 to Plaintiff Evidence in Support of Motion for Summary Judgment, and are Bates stamped by HCL as HC0001-867, are true and accurate copies of documents produced by Human Contract, LLC in response to Requests for Production, propounded by Plaintiff Bart Barber in this action. | Pl. Ex. 1-12, 21, 22.<br>Harris Decl. ¶ ¶ 2, 6-7. |
| 67.<br><br>The paychecks HCL tendered in late February of 2008 to each of the Plaintiffs claim to be "invoices" to "vendors" and fail to provide any information regarding the "gross wages earned" (section 226(a)(1)); "total hours worked" (section 226(a)(2)); "all deductions" (section 226(a)(4)); "inclusive dates | Pl. Ex. 12. |

| | |
|---|---|
| of the period for which the employee is paid" (section 226(a)(6)); four digits from a social security number or an employee identification number (section 226(a)(7)); or "all applicable hourly rates in effect . . . and the corresponding number of hours worked at each hourly rate" (section 226(a)(9)). | |
| 68.<br>Reserved. | Reserved. |
| 69.<br>Exhibit 24 to Plaintiffs Evidence is a true and accurate copy of an email sent on behalf of Human Contract, LLC on or about February 15, 2008, which was produced by HCL in discovery. | Harris Decl., ¶ 9;<br>Pl. Ex. 24. |
| 70.<br>In mid February 2008, Bart Barber was informed by a representative of Human Contract, LLC that he could pick up his payment from an office located in Culver City on my choice of either February 19 or 20, 2008. He went to the Culver City office on February 19, 2008, and received his outstanding final wages. | Barber Decl., ¶ 8 |
| 71.<br>Bernstein was informed that he would be paid his outstanding wages shortly, but was still not compensated until after February 19, 2008. | Bernstein Decl., ¶ 5; |
| 72.<br>Bracken was informed on the phone that he would be paid "very shortly," but was still not mailed his check until late February, more than two months after he was | Bracken Decl., ¶ 6 |

| | |
|---|---|
| discharged. | |
| 73.<br><br>When Buehrle arrived to pick up his check on February 19 or 20, 2008, he was told that he needed to sign a release contract in order to receive his wages. Although he refused to sign the contract, he was provided with his final wages on that day. | Buehrle Decl., ¶ 7; |
| 74.<br><br>Davis received his final paycheck in the mail on or about February 20, 2008. | Davis Decl., ¶ 8 |
| 75.<br><br>Despite, in mid January of 2008, having been informed that he would receive his outstanding wages shortly, Goyer did not receive his outstanding wages until on or after February 20, 2008, with a check cut from Human Contract, LLC, reflecting a check date of January 24, 2008. | Goyer Decl., ¶ 4;<br>Pl. Ex. 12, p. 9. |
| 76.<br><br>The wages Nisar received on or after February 20, 2008, were for three days of work (December 26-28, 2007), which was based upon 24 hours of straight time, and 6 hours of overtime payable at 1.5 times the straight time rate. The total gross wages accounted for in his final paycheck from Human Contract, LLC was for $842.16, and the net amount of $628.44, after taxes had been withheld. | Nisar Decl., ¶ 6;<br>Pl. Ex. 7, pp. 8, 35. |
| 77.<br><br>Turner received his final paycheck on or about | Turner Decl., ¶ 5 |

| | |
|---|---|
| February 19, 2008. It was drawn from a Human Contract, LLC bank account and had a check date of January 24, 2008. | |
| 78.<br>Wade received his final paycheck from Human Contract, LLC after February 20, 2008. It was drawn from a Human Contract, LLC bank account and had a check date of February 8, 2008. | Wade Decl., ¶ 5<br>Pl. Ex., 12, p. 13 |
| 79.<br>After February 21, 2008, Wayton received his final paycheck in the mail from Human Contract, LLC, with a check that had a check date of February 8, 2008. | Wayton Decl., ¶ 5;<br>Pl. Ex., 12, p. 14. |
| 80.<br>The legislative history of the amendment to section 201.5 resulted in the language providing that "payment shall be deemed to have been made on the date that the employee's wages are mailed to the employee or made available to the employee at the location specified by the employer, whichever is earlier." According to the legislative history:<br><br>     This bill, sponsored by the Motion Picture Association of America (MPAA) is the result of a negotiated agreement between employer and employee representatives in the motion picture industry.<br>     . . .<br>     According to the MPAA, litigation was | Harris Decl., ¶ 15;<br>Pl. Ex. 30-40 to 41. |

| | |
|---|---|
| recently settled concerning the application of these provisions.  One of the disputes in the litigation concerned whether employers who paid their employees at the end of a project in accordance with the layoff provision . . . should have paid the employees within 24 hours . . . Another dispute concerned whether the definition of 'motion picture employee' included only those employees who worked on theatrical motion pictures . . . | |
| 81.<br><br>A Settlement Agreement was entered by and between all of the major studios and payroll companies (including Axium) in *Greenberg v. E.P. Management Services, LP, et al*, Los Angeles Superior Court Case No. BC 237787.  This Agreement settled the litigation referenced in the foregoing legislative history.  Alan Harris represented the plaintiff classes in *Greenberg*, and is familiar with that litigation, the Settlement Agreement, and the subsequent legislation.  There was no contention in the litigation regarding whether one could or could not consider an employee to be paid in derogation of the requirements of section 212 of the California Labor Code, requiring that the checking account be funded for at least thirty days.  The amendment to the legislation was not intended to | Harris Decl., ¶ 16; Pl. Ex. 20, 5:5 – 6:4; Pl. Ex. 30. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| | |
|---|---|
| permit an employer to "pay" an employee in derogation of section 212 of the Labor Code. The intent was to fix a date from which continuing wages might be deemed to accrue. Further, details concerning the requirements of section 226 of the Labor Code were extensively covered in the settlement agreement, with special provisions made for Cast & Crew Production Payroll, Inc., clients of Alan Brunswick, an attorney later retained by HCL to ensure that it was in compliance with the California Labor Code. Mr. Brunswick was a signatory to the Settlement Agreement and was well aware of concept that the production company employer's name should be included on a paystub issued by a payroll company. | |
| 82. In Dianda v. PDEI, Inc., Central District of California, Case No. CV 08-1220-VBF (FFMx), a nearly identical case decided by this Court, a crewmember alleged that a production company (Reactor Films) and the payroll company (PDEI, Inc.) acted as his "joint employers." Dianda alleged five causes of action, including violations of Labor Code sections 203, 226, 510, 1194, as well as section 206 of the FLSA. The Court granted summary judgment in favor of the payroll company, PDEI, "finding that no reasonable trier of fact would find that Defendant PDEI, Inc. is the 'employer' of Plaintiff." In Dianda, this Court found that PDEI was not even a "joint employer" under the less stringent | Pl. Ex. 28, p. 2. |

definition of the FLSA.

The FLSA applies to "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). As in <u>Dianda</u>, it would appear that the defense cannot establish that a "joint employer" relationship exists under the "economic reality" of the employment situation. <u>Gilbreath v. Cutter Biological, Inc.</u>, 931 F.2d 1320, 1324 (9th Cir. 1991). As this Court previously recognized:

> The Ninth Circuit has identified four factors to consider in making this determination: whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. <u>Id.</u> However, these particular factors are merely guidelines; they are not etched in stone and will not be blindly applied. The determination of whether an employer-employee relationship exists does not depend on isolated factors but rather upon the circumstances of the whole activity.

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| | |
|---|---|
| <u>Id.</u> (internal citations and quotations omitted).  While this determination is based upon certain factual issues, the ultimate question of whether an employer/employee relationship exists is a question of law.  <u>See Bonnette v. California Health and Welfare Agency</u>, 704 F.2d 1465, 1469 (9th Cir. 1983). | |
| 83.<br>PAV does not appear to have determined the method and rate of payment of wages, as "crew rate was determined either by union contracts or by department heads in consultation with the line producer and UPM," both of whom were HCL employees. | Pl. Ex. 19, 9:3-4. |
| 84.<br>In <u>Serino v. Payday California, Inc.</u>, Central District of California Case No. CV 07-05029-VBF (FFMx), the result was that the payroll company, Payday California, Inc., was not and could not be an "employer" of crewmembers on a production.  This result was reached despite the fact the senior payroll coordinator had confirmed, under oath, that the crewmembers were the payroll company's employees. | Pl. Ex. 29, p. 5-6. |
| 85.<br>HCL has never, until the filing of this Motion, alleged that PAV was an "employer" of Plaintiffs.  HCL failed to allege that PAV or any other entity was the | Pl. Ex. 13-11, 13-12. |

| | |
|---|---|
| employer in its Answer to the Complaint. Further, when asked to identify each person with knowledge of the facts set forth in Bart Barber's Complaint," HCL failed to identify even one person from PAV. | |
| 86.<br>In response to the interrogatory, "IDENTIFY the PERSON or PERSONS in your organization (including outside accountants, consultants, and/or attorneys) who were responsible for your compliance with the California Labor Code," HCL did not identify one individual from PAV. | Pl. Ex. 13-06. |

### ISSUE NO. 2:  Labor Code § 1194

| Plaintiffs Additional Uncontroverted Facts | Plaintiff's Evidence |
|---|---|
| 19.<br>Plaintiff Bart Barber and the Opt-In Collective Action Members are ten members of the crew who worked on the production of the motion picture *The Human Contract*. | Barber Decl., ¶ 2-3;<br>Bernstein Decl., ¶ 2-3;<br>Bracken Decl., ¶ 2-3;<br>Buehrle Decl., ¶ 2-3;<br>Davis Decl., ¶ 2-3;<br>Goyer Decl., ¶ 2-3;<br>Nisar Decl., ¶ 2-3;<br>Turner Decl., ¶ 2-3;<br>Wade Decl., ¶ 2-3;<br>Wayton Decl., ¶ 2-3. |
| 20.<br>Plaintiffs' claims arise out of the fact that none | Barber Decl., ¶ 6, 10;<br>Bernstein Decl., ¶ 5-7; |

| | |
|---|---|
| received his or her final wages for more than 50 days after being discharged, and were not provided proper wage statements. | Bracken Decl., ¶ 6-8; Buehrle Decl., ¶ 6, 8; Davis Decl., ¶ 6, 9-10; Goyer Decl., ¶ 4-6; Nisar Decl., ¶ 5-8; Turner Decl., ¶ 4, 6; Wade Decl., ¶ 4, 6-8; Wayton Decl., ¶ 4, 6-8. |
| 21.<br>All the crew on *The Human Contract* – including Plaintiffs – entered into written employment contracts with Human Contract LLC. | Pl. Ex. 19, 5:9-11. |
| 22.<br>Human Contract, LLC is the entity that entered Collective Bargaining Agreements ("CBA's") with various unions for the making of *The Human Contract*. | Pl. Ex. 19, 6:1 |
| 23.<br>Human Contract, LLC had the power to fire crewmembers. | Pl. Ex. 19, 6:4-6. |
| 24.<br>Plaintiffs were supervised by the line producer, the unit production manager, and department heads. | Pl. Ex. 19, 14:6-8. |
| 25.<br>The line producer, unit production manager, and department heads were all employees of Human Contract LLC. | Pl. Ex. 19, 14:6-8. |

| | |
|---|---|
| 26.<br><br>It was Human Contract, LLC that was responsible for day-to-day supervision of crew members such as Plaintiffs. | Pl. Ex. 19, 6:1 – 7:10. |
| 27.<br><br>It was Human Contract, LLC who had the power to fire crewmembers. | Pl. Ex. 19, 6:6. |
| 28.<br><br>The department heads, the first assistant director, the second assistant director, the crew, the unit production manager, and the line producer all had contractual employment agreements with Human Contract, LLC. | Pl. Ex. 19, 8:18-23. |
| 29.<br><br>Crew rate of pay was determined either by union contracts or by department heads in consultation with the line producer and UPN. | Pl. Ex. 19, 9:3-4. |
| 30.<br><br>The budget, which includes estimates for crew labor, was prepared by the line producer, unit production manager, and production accountant, all three of whom were employed by Human Contract, LLC. | Pl. Ex. 19, 9:7-9. |
| 31.<br><br>HCL was the Plaintiffs' "sole" employer. | Pl. Ex. 13, p. 5:12-18;<br>Pl. Ex. 19, 5:7-11. |
| 32.<br><br>Human Contract, LLC's production accountant, production legal department, and production coordinator (and then, after production was completed, the post-production accountant) maintained crew | Pl. Ex. 19, 9:14-17. |

| | |
|---|---|
| employment records, and many of those records were produced in discovery as Exhibits HC394-775. | |
| 33. Human Contract, LLC is a limited liability company with two members, which was created to produce *The Human Contract*. | Pl. Ex. 19, 4:8-10. |
| 34. PAV Film Services, Inc., was a payroll company chosen and utilized by Human Contract, LLC to process payroll for each of the Plaintiffs and other crewmembers on Production. | Pl. Ex. 19, 9:10-13; Pl. Ex. 1-11. |
| 39. On February 1, 2008, Alison Cohen, Human Contract, LLC's production attorney, was sent an email from Film Finances, Inc., stating, in pertinent part that Human Contract, LLC should "determine[] their legal responsibility to repay [the employees] in light of the axium bankruptcy." | Pl. Ex., 21-04. |
| 40. On February 4, 2008, Human Contract, LLC communicated with Film Finances, Inc., the Production's bonding company, whether Human Contract, LLC might pay its employees from the 10% contingency funds that had already been put aside, or from some other source. | Pl. Ex., 21-01. |
| 41. On or before January 16, 2008, all Plaintiffs had notified a representative of Human Contract, LLC that | Barber Decl., ¶ 6; Bernstein Decl., ¶ 5; Bracken Decl., ¶ 6; |

| | |
|---|---|
| their respective paychecks were not negotiable. | Buehrle Decl., ¶ 6;<br><br>Davis Decl., ¶ 6;<br><br>Goyer Decl., ¶ 4;<br><br>Nisar Decl., ¶ 5;<br><br>Turner Decl., ¶ 4;<br><br>Wade Decl., ¶ 4;<br><br>Wayton Decl., ¶ 4. |
| 42.<br><br>Human Contract, LLC claims that it did not immediately provide final payment of wages to Plaintiffs was due to the fact that, "there was no money in the film's budget to pay a second time wages of those employees who did not deposit their checks when they received them . . . [and] Human Contract, LLC needed to obtain approval from the bonding company to use the contingency to repay the wages a second time." | Pl. Ex. 18, 2:19-24 |
| 43.<br><br>Except for Jeffrey Goyer, each of the Plaintiffs deposited their nonnegotiable paychecks from PAV shortly after receipt, in early January 2008. | Barber Decl., ¶ 6;<br><br>Bernstein Decl., ¶ 5;<br><br>Bracken Decl., ¶ 6;<br><br>Buehrle Decl., ¶ 6;<br><br>Davis Decl., ¶ 6;<br><br>Nisar Decl., ¶ 5;<br><br>Turner Decl., ¶ 4;<br><br>Wade Decl., ¶ 4;<br><br>Wayton Decl., ¶ 4. |
| 44.<br><br>The checks each Plaintiff received in or about early | Barber Decl., ¶ 6;<br><br>Bernstein Decl., ¶ 5; |

| | |
|---|---|
| January 2008, for the work they performed in December 2007 were nonnegotiable, and accordingly their payment of final wages remained outstanding until on or after February 19, 2008. | Bracken Decl., ¶ 6; Buehrle Decl., ¶ 6; Davis Decl., ¶ 6; Nisar Decl., ¶ 5; Turner Decl., ¶ 4; Wade Decl., ¶ 4; Wayton Decl., ¶ 4.<br><br>Pl. Ex., 16-4:11-25. |
| 45.<br><br>Human Contract, LLC did not make payment of Plaintiffs' final wages available to them until February 19, 2008. | Pl. Ex., 16-4:11-25. |
| 47.<br><br>Those document which are included in Exhibits 1-12, 21, &22 to Plaintiff Evidence in Support of Motion for Summary Judgment, and are Bates stamped by HCL as HC0001-867, are true and accurate copies of documents produced by Human Contract, LLC in response to Requests for Production, propounded by Plaintiff Bart Barber in this action. | Pl. Ex. 1-12, 21, 22.<br>Harris Decl. ¶ ¶ 2, 6-7. |
| 49.<br><br>The paychecks HCL tendered in late February of 2008 to each of the Plaintiffs claim to be "invoices" to "vendors" and fail to provide any information regarding the "gross wages earned" (section 226(a)(1)); "total hours worked" (section 226(a)(2)); "all deductions" (section 226(a)(4)); "inclusive dates | Pl. Ex. 12. |

| | |
|---|---|
| of the period for which the employee is paid" (section 226(a)(6)); four digits from a social security number or an employee identification number (section 226(a)(7)); or "all applicable hourly rates in effect . . . and the corresponding number of hours worked at each hourly rate" (section 226(a)(9)). | |
| 50.<br>On January 25, 2008, Scott Trivigno, for PAV, provided to Dave Koplan, for HCL, "a listing of all checks for this project that have not been cleared by Bank of America," as of January 11, 2008. On February 1, 2008, Alison Cohen, acting for HC, wrote to the bonding company, Film Finances: "I understand that representatives of Film Finances have authorized Human Contract, LLC to re-pay the cast and crew of Human Contract whose checks bounced due to the Axium bankruptcy from our contingency." On February 1, 2008, Clay Steward, for Film Finances, responded to Alison Cohen: "I would say it is inaccurate to state that we have authorized production to 're-pay' the case and crew. Rather, this amount should be reserved until producers have determined their legal responsibility to repay in light of the axiom bankruptcy." Alison Cohen for HC responded to Clay Steward for Film Finances: "OK, so you don't want us to be writing checks? I think people at Film Finances are telling production to do it." Thereafter, Steve Ransohoff of Film Finances wrote to Alison | Pl. Ex. 21, pp. 06-10; |

Cohen for HC:  "In the first instance, the decision of whether or not the company is required to make payment to the individual with bounced checks is a decision that has to be made by the company. . . . I have seen some correspondence about our authorizing that payments should or should not be made and this, as noted above, is really something for the producers to determine in the first instance."  Alison Cohen responded to Ransohoff:  "We have all come to the conclusion that we are legally obligated to make these payments to our cast and crew a second time because we are the contracting party on all cast and crew agreements.  Accordingly, our contingency is going to be pretty depleted.  Does Film Finance approve of this expenditure . . . . We just want to make sure that in the event there are unsorseen overages in excess of the contingency that Film Finances will cover them."  Steward responded on February 4, 2008:  "If that is the production's decision, then FFI will support that . . . the bond speaks for itself . . ."  On February 4, 2008, Cohen made one final inquiry of Film Finances, but the response, if any, has not been forthcoming in discovery:  ". . . I don't deal in these matters on a regular basis, do you mind if I put this in plain/laypersons English?  Specifically, Film Finances is saying that if Human Contract LLC elects to repay the bounced Axium checks, which Human Contract LLC may chose to do in it's sole discretion, that Film

| | |
|---|---|
| Finances consents thereto.  This consent by Film Finances means that to the extent such payments deplete the contingency for the picture, Film Finances will nonetheless still cover future overages provides such overages are not due to 'elective-type' enhancements that were not in the original bonded budget for the picture.  Please confirm by return email that this is correct."  Many days passed before the crew was paid. | |
| 51.<br>Exhibit 24 to Plaintiffs Evidence is a true and accurate copy of an email sent on behalf of Human Contract, LLC on or about February 15, 2008, which was produced by HCL in discovery. | Harris Decl., ¶ 9;<br>Pl. Ex. 24. |
| 53.<br>Black's Law Dictionary defines "Payment" as "performance of an obligation by the delivery of money or some other valuable thing, accepted in partial or full discharge of the obligation . . . the money or other valuable thing so delivered in satisfaction of an obligation." | Pl. Ex. 25. |
| 54.<br>Black's Law Dictionary defines "Wages" as "payment for labor or services . . ." | Pl. Ex. 26. |
| 55.<br>This Court has previously determined that entertainment payroll companies like Axium are not an employer of crewmembers in the entertainment | Harris Decl., ¶ 13-14.<br>Pl. Ex. 28-29. |

| | |
|---|---|
| industry. | |
| 58.<br><br>On February 1, 2008, Alison Cohen, Human Contract, LLC's production attorney, was sent an email from Film Finances, Inc., stating, in pertinent part that Human Contract, LLC should "determine[] their legal responsibility to repay [the employees] in light of the axium bankruptcy." | Pl. Ex., 21-04. |
| 59.<br><br>On February 4, 2008, Film Finances, Inc., the Production's bonding company, opined that Human Contract LLC might pay its employees from the 10% contingency funds that had already been put aside, or from some other source. | Pl. Ex., 21-01. |
| 60.<br><br>Human Contract, LLC first learned, on or about January 8, 2008, that Axium had closed down. | Pl. Ex., 17, 2:10-22. |
| 61.<br><br>On or before January 16, 2008, all Plaintiffs had notified a representative of Human Contract, LLC that their respective paychecks were not negotiable. | Barber Decl., ¶ 6;<br><br>Bernstein Decl., ¶ 5;<br><br>Bracken Decl., ¶ 6;<br><br>Buehrle Decl., ¶ 6;<br><br>Davis Decl., ¶ 6;<br><br>Goyer Decl., ¶ 4;<br><br>Nisar Decl., ¶ 5;<br><br>Turner Decl., ¶ 4;<br><br>Wade Decl., ¶ 4;<br><br>Wayton Decl., ¶ 4. |
| 62. | Pl. Ex. 18, 2:19-24 |

| | |
|---|---|
| Human Contract, LLC claims that it did not immediately provide final payment of wages to Plaintiffs was due to the fact that, "there was no money in the film's budget to pay a second time wages of those employees who did not deposit their checks when they received them . . . [and] Human Contract, LLC needed to obtain approval from the bonding company to use the contingency to repay the wages a second time." | |
| 63. <br> Except for Jeffrey Goyer, each of the Plaintiffs deposited their nonnegotiable paychecks from PAV shortly after receipt. | Barber Decl., ¶ 6; <br> Bernstein Decl., ¶ 5; <br> Bracken Decl., ¶ 6; <br> Buehrle Decl., ¶ 6; <br> Davis Decl., ¶ 6; <br> Nisar Decl., ¶ 5; <br> Turner Decl., ¶ 4; <br> Wade Decl., ¶ 4; <br> Wayton Decl., ¶ 4. |
| 64. <br> Human Contract, LLC did not make Plaintiffs' final wages available to them until February 19, 2008. | Pl. Ex., 16-4:11-25. |
| 66. <br> Those documents which are included in Exhibits 1-12, 21, &22 to Plaintiff Evidence in Support of Motion for Summary Judgment, and are Bates stamped by HCL as HC0001-867, are true and accurate copies of documents produced by Human Contract, LLC in response to Requests for Production, propounded by | Pl. Ex. 1-12, 21, 22. <br> Harris Decl. ¶ ¶ 2, 6-7. |

| | |
|---|---|
| Plaintiff Bart Barber in this action. | |
| 67. The paychecks HCL tendered in late February of 2008 to each of the Plaintiffs claim to be "invoices" to "vendors" and fail to provide any information regarding the "gross wages earned" (section 226(a)(1)); "total hours worked" (section 226(a)(2)); "all deductions" (section 226(a)(4)); "inclusive dates of the period for which the employee is paid" (section 226(a)(6)); four digits from a social security number or an employee identification number (section 226(a)(7)); or "all applicable hourly rates in effect . . . and the corresponding number of hours worked at each hourly rate" (section 226(a)(9)). | Pl. Ex. 12. |
| 69. Exhibit 24 to Plaintiffs Evidence is a true and accurate copy of an email sent on behalf of Human Contract, LLC on or about February 15, 2008, which was produced by HCL in discovery. | Harris Decl., ¶ 9; Pl. Ex. 24. |
| 70. In mid February 2008, Bart Barber was informed by a representative of Human Contract, LLC that he could pick up his payment from an office located in Culver City on my choice of either February 19 or 20, 2008. He went to the Culver City office on February 19, 2008, and received his outstanding final wages. | Barber Decl., ¶ 8 |
| 71. Bernstein was informed that he would be paid his | Bernstein Decl., ¶ 5; |

| | |
|---|---|
| outstanding wages shortly, but was still not compensated until after February 19, 2008. | |
| 72.<br><br>Bracken was informed on the phone that he would be paid "very shortly," but was still not mailed his check until late February, more than two months after he was discharged. | Bracken Decl., ¶ 6 |
| 73.<br><br>When Buehrle arrived to pick up his check on February 19 or 20, 2008, he was told that he needed to sign a release contract in order to receive his wages. Although he refused to sign the contract, he was provided with his final wages on that day. | Buehrle Decl., ¶ 7; |
| 74.<br><br>Davis received his final paycheck in the mail on or about February 20, 2008. | Davis Decl., ¶ 8 |
| 75.<br><br>Despite, in mid January of 2008, having being informed that he would receive his outstanding wages shortly, Goyer did not receive his outstanding wages until on or after February 20, 2008, with a check cut from Human Contract, LLC, reflecting a check date of January 24, 2008. | Goyer Decl., ¶ 4;<br>Pl. Ex. 12, p. 9. |
| 76.<br><br>The wages Nisar received on or after February 20, 2008, were for three days of work (December 26-28, 2007), which was based upon 24 hours of straight time, and 6 hours of overtime payable at 1.5 times the | Nisar Decl., ¶ 6;<br>Pl. Ex. 7, pp. 8, 35. |

| | |
|---|---|
| straight time rate. The total gross wages accounted for in his final paycheck from Human Contract, LLC was for $842.16, and the net amount of $628.44, after taxes had been withheld. | |
| 77.<br>Turner received his final paycheck on or about February 19, 2008. It was drawn from a Human Contract, LLC bank account and had a check date of January 24, 2008. | Turner Decl., ¶ 5 |
| 78.<br>Wade received his final paycheck from Human Contract, LLC after February 20, 2008. It was drawn from a Human Contract, LLC bank account and had a check date of February 8, 2008. | Wade Decl., ¶ 5<br>Pl. Ex., 12, p. 13 |
| 79.<br>After February 21, 2008, Wayton received his final paycheck in the mail from Human Contract, LLC, with a check that had a check date of February 8, 2008. | Wayton Decl., ¶ 5;<br>Pl. Ex., 12, p. 14. |
| 80.<br>The legislative history of the amendment to section 201.5 resulted in the language providing that "payment shall be deemed to have been made on the date that the employee's wages are mailed to the employee or made available to the employee at the location specified by the employer, whichever is earlier." According to the legislative history:<br><br>This bill, sponsored by the Motion<br>Picture Association of America (MPAA) | Harris Decl., ¶ 15;<br>Pl. Ex. 30-40 to 41. |

| | |
|---|---|
| is the result of a negotiated agreement between employer and employee representatives in the motion picture industry.<br><br>. . .<br><br>According to the MPAA, litigation was recently settled concerning the application of these provisions.  One of the disputes in the litigation concerned whether employers who paid their employees at the end of a project in accordance with the layoff provision . . . should have paid the employees within 24 hours . . . Another dispute concerned whether the definition of 'motion picture employee' included only those employees who worked on theatrical motion pictures . . . | |
| 81.<br>A Settlement Agreement was entered by and between all of the major studios and payroll companies (including Axium) in *Greenberg v. E.P. Management Services, LP, et al*, Los Angeles Superior Court Case No. BC 237787.  This Agreement settled the litigation referenced in the foregoing legislative history.  Alan Harris represented the plaintiff classes in *Greenberg*, and is familiar with that litigation, the Settlement Agreement, and the subsequent legislation.  There was | Harris Decl., ¶ 16; Pl. Ex. 20, 5:5 – 6:4; Pl. Ex. 30. |

no contention in the litigation regarding whether one could or could not consider an employee to be paid in derogation of the requirements of section 212 of the California Labor Code, requiring that the checking account be funded for at least thirty days. The amendment to the legislation was not intended to permit an employer to "pay" an employee in derogation of section 212 of the Labor Code. The intent was to fix a date from which continuing wages might be deemed to accrue. Further, details concerning the requirements of section 226 of the Labor Code were extensively covered in the settlement agreement, with special provisions made for Cast & Crew Production Payroll, Inc., clients of Alan Brunswick, an attorney later retained by HCL to ensure that it was in compliance with the California Labor Code. Mr. Brunswick was a signatory to the Settlement Agreement and was well aware of concept that the production company employer's name should be included on a paystub issued by a payroll company.

82.

In <u>Dianda v. PDEI, Inc.</u>, Central District of California, Case No. CV 08-1220-VBF (FFMx), a nearly identical case decided by this Court, a crewmember alleged that a production company (Reactor Films) and the payroll company (PDEI, Inc.) acted as his "joint employers." Dianda alleged five causes of action, including violations of Labor Code sections 203, 226, 510, 1194,

Pl. Ex. 28, p. 2.

as well as section 206 of the FLSA.  The Court granted

summary judgment in favor of the payroll company,

PDEI, "finding that no reasonable trier of fact would

find that Defendant PDEI, Inc. is the 'employer' of

Plaintiff."  In <u>Dianda</u>, this Court found that PDEI was

not even a "joint employer" under the less stringent

definition of the FLSA.

> The FLSA applies to "any person acting directly
> or indirectly in the interest of an employer in
> relation to an employee." 29 U.S.C. § 203(d).
> As in <u>Dianda</u>, it would appear that the defense
> cannot establish that a "joint employer"
> relationship exists under the "economic reality"
> of the employment situation.  <u>Gilbreath v. Cutter
> Biological, Inc.</u>, 931 F.2d 1320, 1324 (9th Cir.
> 1991).  As this Court previously recognized:
>
>> The Ninth Circuit has identified four
>> factors to consider in making this
>> determination:  whether the alleged
>> employer (1) had the power to hire
>> and fire the employees, (2)
>> supervised and controlled employee
>> work schedules or conditions of
>> employment, (3) determined the rate
>> and method of  payment, and (4)
>> maintained employment records.  <u>Id.</u>
>> However, these particular factors are
>> merely guidelines; they are not

| | |
|---|---|
| etched in stone and will not be blindly applied.  The determination of whether an employer-employee relationship exists does not depend on isolated factors but rather upon the circumstances of the whole activity. <u>Id.</u> (internal citations and quotations omitted).  While this determination is based upon certain factual issues, the ultimate question of whether an employer/employee relationship exists is a question of law.  <u>See</u> <u>Bonnette v. California Health and</u> <u>Welfare Agency</u>, 704 F.2d 1465, 1469 (9th Cir. 1983). | |
| 83. PAV does not appear to have determined the method and rate of payment of wages, as "crew rate was determined either by union contracts or by department heads in consultation with the line producer and UPM," both of whom were HCL employees. | Pl. Ex. 19, 9:3-4. |
| 84. In <u>Serino v. Payday California, Inc.</u>, Central District of California Case No. CV 07-05029-VBF (FFMx), the result was that the payroll company, Payday California, Inc., was not and could not be an "employer" of crewmembers on a production.  This result was reached despite the fact the senior payroll | Pl. Ex. 29, p. 5-6. |

| | |
|---|---|
| coordinator had confirmed, under oath, that the crewmembers were the payroll company's employees. | |
| 85. HCL has never, until the filing of this Motion, alleged that PAV was an "employer" of Plaintiffs. HCL failed to allege that PAV or any other entity was the employer in its Answer to the Complaint. Further, when asked to identify each person with knowledge of the facts set forth in Bart Barber's Complaint," HCL failed to identify even one person from PAV. | Pl. Ex. 13-11, 13-12. |
| 86. In response to the interrogatory, "IDENTIFY the PERSON or PERSONS in your organization (including outside accountants, consultants, and/or attorneys) who were responsible for your compliance with the California Labor Code," HCL did not identify one individual from PAV. | Pl. Ex. 13-06. |

**ISSUE NO. 3:  Fair Labor Standards Act, 29 U.S.C. §§ 206, 207**

| Plaintiffs Additional Uncontroverted Facts | Plaintiff's Evidence |
|---|---|
| 19. Plaintiff Bart Barber and the Opt-In Collective Action Members are ten members of the crew who worked on the production of the motion picture *The Human Contract*. | Barber Decl., ¶ 2-3; Bernstein Decl., ¶ 2-3; Bracken Decl., ¶ 2-3; Buehrle Decl., ¶ 2-3; Davis Decl., ¶ 2-3; |

| | |
|---|---|
| | Goyer Decl., ¶ 2-3; |
| | Nisar Decl., ¶ 2-3; |
| | Turner Decl., ¶ 2-3; |
| | Wade Decl., ¶ 2-3; |
| | Wayton Decl., ¶ 2-3. |
| 20.<br><br>Plaintiffs' claims arise out of the fact that none received his or her final wages for more than 50 days after being discharged, and were not provided proper wage statements. | Barber Decl., ¶ 6, 10;<br>Bernstein Decl., ¶ 5-7;<br>Bracken Decl., ¶ 6-8;<br>Buehrle Decl., ¶ 6, 8;<br>Davis Decl., ¶ 6, 9-10;<br>Goyer Decl., ¶ 4-6;<br>Nisar Decl., ¶ 5-8;<br>Turner Decl., ¶ 4, 6;<br>Wade Decl., ¶ 4, 6-8;<br>Wayton Decl., ¶ 4, 6-8. |
| 21.<br><br>All the crew on *The Human Contract* – including Plaintiffs – entered into written employment contracts with Human Contract LLC. | Pl. Ex. 19, 5:9-11. |
| 22.<br><br>Human Contract, LLC is the entity that entered Collective Bargaining Agreements ("CBA's") with various unions for the making of *The Human Contract*. | Pl. Ex. 19, 6:1 |
| 23.<br><br>Human Contract, LLC had the power to fire crewmembers. | Pl. Ex. 19, 6:4-6. |

| | |
|---|---|
| 24.<br><br>Plaintiffs were supervised by the line producer, the unit production manager, and department heads. | Pl. Ex. 19, 14:6-8. |
| 25.<br><br>The line producer, unit production manager, and department heads were all employees of Human Contract LLC. | Pl. Ex. 19, 14:6-8. |
| 26.<br><br>It was Human Contract, LLC that was responsible for day-to-day supervision of crew members such as Plaintiffs. | Pl. Ex. 19, 6:1 – 7:10. |
| 27.<br><br>It was Human Contract, LLC who had the power to fire crewmembers. | Pl. Ex. 19, 6:6. |
| 28.<br><br>The department heads, the first assistant director, the second assistant director, the crew, the unit production manager, and the line producer all had contractual employment agreements with Human Contract, LLC. | Pl. Ex. 19, 8:18-23. |
| 29.<br><br>Crew rate of pay was determined either by union contracts or by department heads in consultation with the line producer and UPN. | Pl. Ex. 19, 9:3-4. |
| 30.<br><br>The budget, which includes estimates for crew labor, was prepared by the line producer, unit production manager, and production accountant, all three of whom were employed by Human Contract, LLC. | Pl. Ex. 19, 9:7-9. |

| | |
|---|---|
| 31.<br><br>HCL was the Plaintiffs' "sole" employer. | Pl. Ex. 13, p. 5:12-18;<br>Pl. Ex. 19, 5:7-11. |
| 32.<br><br>Human Contract, LLC's production accountant, production legal department, and production coordinator (and then, after production was completed, the post-production accountant) maintained crew employment records, and many of those records were produced in discovery as Exhibits HC394-775. | Pl. Ex. 19, 9:14-17. |
| 33.<br><br>Human Contract, LLC is a limited liability company with two members, which was created to produce *The Human Contract*. | Pl. Ex. 19, 4:8-10. |
| 34.<br><br>PAV Film Services, Inc., was a payroll company chosen and utilized by Human Contract, LLC to process payroll for each of the Plaintiffs and other crewmembers on Production. | Pl. Ex. 19, 9:10-13;<br>Pl. Ex. 1-11. |
| 39.<br><br>On February 1, 2008, Alison Cohen, Human Contract, LLC's production attorney, was sent an email from Film Finances, Inc., stating, in pertinent part that Human Contract, LLC should "determine[] their legal responsibility to repay [the employees] in light of the axium bankruptcy." | Pl. Ex., 21-04. |
| 40.<br><br>On February 4, 2008, Human Contract, LLC communicated with Film Finances, Inc., the | Pl. Ex., 21-01. |

| | |
|---|---|
| Production's bonding company, whether Human Contract, LLC might pay its employees from the 10% contingency funds that had already been put aside, or from some other source. | |
| 41.<br><br>On or before January 16, 2008, all Plaintiffs had notified a representative of Human Contract, LLC that their respective paychecks were not negotiable. | Barber Decl., ¶ 6;<br>Bernstein Decl., ¶ 5;<br>Bracken Decl., ¶ 6;<br>Buehrle Decl., ¶ 6;<br>Davis Decl., ¶ 6;<br>Goyer Decl., ¶ 4;<br>Nisar Decl., ¶ 5;<br>Turner Decl., ¶ 4;<br>Wade Decl., ¶ 4;<br>Wayton Decl., ¶ 4. |
| 42.<br><br>Human Contract, LLC claims that it did not immediately provide final payment of wages to Plaintiffs was due to the fact that, "there was no money in the film's budget to pay a second time wages of those employees who did not deposit their checks when they received them . . . [and] Human Contract, LLC needed to obtain approval from the bonding company to use the contingency to repay the wages a second time." | Pl. Ex. 18, 2:19-24 |
| 43.<br><br>Except for Jeffrey Goyer, each of the Plaintiffs deposited their nonnegotiable paychecks from PAV shortly after receipt, in early January 2008. | Barber Decl., ¶ 6;<br>Bernstein Decl., ¶ 5;<br>Bracken Decl., ¶ 6;<br>Buehrle Decl., ¶ 6; |

| | |
|---|---|
| | Davis Decl., ¶ 6; |
| | Nisar Decl., ¶ 5; |
| | Turner Decl., ¶ 4; |
| | Wade Decl., ¶ 4; |
| | Wayton Decl., ¶ 4. |
| 44.<br><br>The checks each Plaintiff received in or about early January 2008, for the work they performed in December 2007 were nonnegotiable, and accordingly their payment of final wages remained outstanding until on or after February 19, 2008. | Barber Decl., ¶ 6;<br>Bernstein Decl., ¶ 5;<br>Bracken Decl., ¶ 6;<br>Buehrle Decl., ¶ 6;<br>Davis Decl., ¶ 6;<br>Nisar Decl., ¶ 5;<br>Turner Decl., ¶ 4;<br>Wade Decl., ¶ 4;<br>Wayton Decl., ¶ 4.<br><br>Pl. Ex., 16-4:11-25. |
| 45.<br><br>Human Contract, LLC did not make payment of Plaintiffs' final wages available to them until February 19, 2008. | Pl. Ex., 16-4:11-25. |
| 47.<br><br>Those document which are included in Exhibits 1-12, 21, &22 to Plaintiff Evidence in Support of Motion for Summary Judgment, and are Bates stamped by HCL as HC0001-867, are true and accurate copies of documents produced by Human Contract, LLC in response to Requests for Production, propounded by Plaintiff Bart Barber in this action. | Pl. Ex. 1-12, 21, 22.<br>Harris Decl. ¶¶ 2, 6-7. |

| | |
|---|---|
| 48.<br><br>When employed by HCL, Plaintiffs were engaged in commerce or in the production of goods for commerce, as required by the FLSA. | Carlson Decl., ¶ 20. |
| 49.<br><br>The paychecks HCL tendered in late February of 2008 to each of the Plaintiffs claim to be "invoices" to "vendors" and fail to provide any information regarding the "gross wages earned" (section 226(a)(1)); "total hours worked" (section 226(a)(2)); "all deductions" (section 226(a)(4)); "inclusive dates of the period for which the employee is paid" (section 226(a)(6)); four digits from a social security number or an employee identification number (section 226(a)(7)); or "all applicable hourly rates in effect . . . and the corresponding number of hours worked at each hourly rate" (section 226(a)(9)). | Pl. Ex. 12. |
| 50.<br><br>On January 25, 2008, Scott Trivigno, for PAV, provided to Dave Koplan, for HCL, "a listing of all checks for this project that have not been cleared by Bank of America," as of January 11, 2008. On February 1, 2008, Alison Cohen, acting for HC, wrote to the bonding company, Film Finances: "I understand that representatives of Film Finances have authorized Human Contract, LLC to re-pay the cast and crew of Human Contract whose checks bounced due to the Axium bankruptcy from our contingency." On | Pl. Ex. 21, pp. 06-10; |

February 1, 2008, Clay Steward, for Film Finances,
responded to Alison Cohen: "I would say it is
inaccurate to state that we have authorized production
to 're-pay' the case and crew. Rather, this amount
should be reserved until producers have determined
their legal responsibility to repay in light of the axiom
bankruptcy." Alison Cohen for HC responded to Clay
Steward for Film Finances: "OK, so you don't want
us to be writing checks? I think people at Film
Finances are telling production to do it." Thereafter,
Steve Ransohoff of Film Finances wrote to Alison
Cohen for HC: "In the first instance, the decision of
whether or not the company is required to make
payment to the individual with bounced checks is a
decision that has to be made by the company. . . . I
have seen some correspondence about our authorizing
that payments should or should not be made and this,
as noted above, is really something for the producers
to determine in the first instance." Alison Cohen
responded to Ransohoff: "We have all come to the
conclusion that we are legally obligated to make these
payments to our cast and crew a second time because
we are the contracting party on all cast and crew
agreements. Accordingly, our contingency is going to
be pretty depleted. Does Film Finance approve of this
expenditure . . . . We just want to make sure that in the
event there are unsorseen overages in excess of the
contingency that Film Finances will cover them."

Steward responded on February 4, 2008: "If that is the production's decision, then FFI will support that . . . the bond speaks for itself . . ." On February 4, 2008, Cohen made one final inquiry of Film Finances, but the response, if any, has not been forthcoming in discovery: ". . . I don't deal in these matters on a regular basis, do you mind if I put this in plain/laypersons English? Specifically, Film Finances is saying that if Human Contract LLC elects to repay the bounced Axium checks, which Human Contract LLC may chose to do in it's sole discretion, that Film Finances consents thereto. This consent by Film Finances means that to the extent such payments deplete the contingency for the picture, Film Finances will nonetheless still cover future overages provides such overages are not due to 'elective-type' enhancements that were not in the original bonded budget for the picture. Please confirm by return email that this is correct." Many days passed before the crew was paid.

| | |
|---|---|
| 51.<br><br>Exhibit 24 to Plaintiffs Evidence is a true and accurate copy of an email sent on behalf of Human Contract, LLC on or about February 15, 2008, which was produced by HCL in discovery. | Harris Decl., ¶ 9;<br>Pl. Ex. 24. |
| 53.<br><br>Black's Law Dictionary defines "Payment" as "performance of an obligation by the delivery of | Pl. Ex. 25. |

| | |
|---|---|
| money or some other valuable thing, accepted in partial or full discharge of the obligation . . . the money or other valuable thing so delivered in satisfaction of an obligation." | |
| 54.<br>Black's Law Dictionary defines "Wages" as "payment for labor or services . . ." | Pl. Ex. 26. |
| 55.<br>This Court has previously determined that entertainment payroll companies like Axium are not an employer of crewmembers in the entertainment industry. | Harris Decl., ¶ 13-14.<br>Pl. Ex. 28-29. |
| 58.<br>On February 1, 2008, Alison Cohen, Human Contract, LLC's production attorney, was sent an email from Film Finances, Inc., stating, in pertinent part that Human Contract, LLC should "determine[] their legal responsibility to repay [the employees] in light of the axium bankruptcy." | Pl. Ex., 21-04. |
| 59.<br>On February 4, 2008, Film Finances, Inc., the Production's bonding company, opined that Human Contract LLC might pay its employees from the 10% contingency funds that had already been put aside, or from some other source. | Pl. Ex., 21-01. |
| 60.<br>Human Contract, LLC first learned, on or about January 8, 2008, that Axium had closed down. | Pl. Ex., 17, 2:10-22. |

| | |
|---|---|
| 61.<br><br>On or before January 16, 2008, all Plaintiffs had notified a representative of Human Contract, LLC that their respective paychecks were not negotiable. | Barber Decl., ¶ 6;<br>Bernstein Decl., ¶ 5;<br>Bracken Decl., ¶ 6;<br>Buehrle Decl., ¶ 6;<br>Davis Decl., ¶ 6;<br>Goyer Decl., ¶ 4;<br>Nisar Decl., ¶ 5;<br>Turner Decl., ¶ 4;<br>Wade Decl., ¶ 4;<br>Wayton Decl., ¶ 4. |
| 62.<br><br>Human Contract, LLC claims that it did not immediately provide final payment of wages to Plaintiffs was due to the fact that, "there was no money in the film's budget to pay a second time wages of those employees who did not deposit their checks when they received them . . . [and] Human Contract, LLC needed to obtain approval from the bonding company to use the contingency to repay the wages a second time." | Pl. Ex. 18, 2:19-24 |
| 63.<br><br>Except for Jeffrey Goyer, each of the Plaintiffs deposited their nonnegotiable paychecks from PAV shortly after receipt. | Barber Decl., ¶ 6;<br>Bernstein Decl., ¶ 5;<br>Bracken Decl., ¶ 6;<br>Buehrle Decl., ¶ 6;<br>Davis Decl., ¶ 6;<br>Nisar Decl., ¶ 5;<br>Turner Decl., ¶ 4;<br>Wade Decl., ¶ 4; |

| | |
|---|---|
| | Wayton Decl., ¶ 4. |
| 64.<br><br>Human Contract, LLC did not make Plaintiffs' final wages available to them until February 19, 2008. | Pl. Ex., 16-4:11-25. |
| 66.<br><br>Those documents which are included in Exhibits 1-12, 21, &22 to Plaintiff Evidence in Support of Motion for Summary Judgment, and are Bates stamped by HCL as HC0001-867, are true and accurate copies of documents produced by Human Contract, LLC in response to Requests for Production, propounded by Plaintiff Bart Barber in this action. | Pl. Ex. 1-12, 21, 22.<br><br>Harris Decl. ¶ ¶ 2, 6-7. |
| 67.<br><br>The paychecks HCL tendered in late February of 2008 to each of the Plaintiffs claim to be "invoices" to "vendors" and fail to provide any information regarding the "gross wages earned" (section 226(a)(1)); "total hours worked" (section 226(a)(2)); "all deductions" (section 226(a)(4)); "inclusive dates of the period for which the employee is paid" (section 226(a)(6)); four digits from a social security number or an employee identification number (section 226(a)(7)); or "all applicable hourly rates in effect . . . and the corresponding number of hours worked at each hourly rate" (section 226(a)(9)). | Pl. Ex. 12. |
| 69.<br><br>Exhibit 24 to Plaintiffs Evidence is a true and accurate copy of an email sent on behalf of Human Contract, | Harris Decl., ¶ 9;<br><br>Pl. Ex. 24. |

| | |
|---|---|
| LLC on or about February 15, 2008, which was produced by HCL in discovery. | |
| 70.<br><br>In mid February 2008, Bart Barber was informed by a representative of Human Contract, LLC that he could pick up his payment from an office located in Culver City on my choice of either February 19 or 20, 2008. He went to the Culver City office on February 19, 2008, and received his outstanding final wages. | Barber Decl., ¶ 8 |
| 71.<br><br>Bernstein was informed that he would be paid his outstanding wages shortly, but was still not compensated until after February 19, 2008. | Bernstein Decl., ¶ 5; |
| 72.<br><br>Bracken was informed on the phone that he would be paid "very shortly," but was still not mailed his check until late February, more than two months after he was discharged. | Bracken Decl., ¶ 6 |
| 73.<br><br>When Buehrle arrived to pick up his check on February 19 or 20, 2008, he was told that he needed to sign a release contract in order to receive his wages. Although he refused to sign the contract, he was provided with his final wages on that day. | Buehrle Decl., ¶ 7; |
| 74.<br><br>Davis received his final paycheck in the mail on or about February 20, 2008. | Davis Decl., ¶ 8 |
| 75. | Goyer Decl., ¶ 4; |

| | |
|---|---|
| Despite, in mid January of 2008, having being informed that he would receive his outstanding wages shortly, Goyer did not receive his outstanding wages until on or after February 20, 2008, with a check cut from Human Contract, LLC, reflecting a check date of January 24, 2008. | Pl. Ex. 12, p. 9. |
| 76.<br><br>The wages Nisar received on or after February 20, 2008, were for three days of work (December 26-28, 2007), which was based upon 24 hours of straight time, and 6 hours of overtime payable at 1.5 times the straight time rate. The total gross wages accounted for in his final paycheck from Human Contract, LLC was for $842.16, and the net amount of $628.44, after taxes had been withheld. | Nisar Decl., ¶ 6;<br>Pl. Ex. 7, pp. 8, 35. |
| 77.<br><br>Turner received his final paycheck on or about February 19, 2008. It was drawn from a Human Contract, LLC bank account and had a check date of January 24, 2008. | Turner Decl., ¶ 5 |
| 78.<br><br>Wade received his final paycheck from Human Contract, LLC after February 20, 2008. It was drawn from a Human Contract, LLC bank account and had a check date of February 8, 2008. | Wade Decl., ¶ 5<br>Pl. Ex., 12, p. 13 |
| 79.<br><br>After February 21, 2008, Wayton received his final paycheck in the mail from Human Contract, LLC, with | Wayton Decl., ¶ 5;<br>Pl. Ex., 12, p. 14. |

| | |
|---|---|
| a check that had a check date of February 8, 2008. | |
| 80. | Harris Decl., ¶ 15; |
| The legislative history of the amendment to section 201.5 resulted in the language providing that "payment shall be deemed to have been made on the date that the employee's wages are mailed to the employee or made available to the employee at the location specified by the employer, whichever is earlier." According to the legislative history: | Pl. Ex. 30-40 to 41. |

> This bill, sponsored by the Motion
> Picture Association of America (MPAA)
> is the result of a negotiated agreement
> between employer and employee
> representatives in the motion picture
> industry.
>
> . . .
>
> According to the MPAA, litigation was
> recently settled concerning the
> application of these provisions. One of
> the disputes in the litigation concerned
> whether employers who paid their
> employees at the end of a project in
> accordance with the layoff provision . . .
> should have paid the employees within
> 24 hours . . . Another dispute concerned
> whether the definition of 'motion picture
> employee' included only those
> employees who worked on theatrical

| | |
|---|---|
| motion pictures . . . | |
| 81. <br><br> A Settlement Agreement was entered by and between all of the major studios and payroll companies (including Axium) in *Greenberg v. E.P. Management Services, LP, et al*, Los Angeles Superior Court Case No. BC 237787. This Agreement settled the litigation referenced in the foregoing legislative history. Alan Harris represented the plaintiff classes in *Greenberg*, and is familiar with that litigation, the Settlement Agreement, and the subsequent legislation. There was no contention in the litigation regarding whether one could or could not consider an employee to be paid in derogation of the requirements of section 212 of the California Labor Code, requiring that the checking account be funded for at least thirty days. The amendment to the legislation was not intended to permit an employer to "pay" an employee in derogation of section 212 of the Labor Code. The intent was to fix a date from which continuing wages might be deemed to accrue. Further, details concerning the requirements of section 226 of the Labor Code were extensively covered in the settlement agreement, with special provisions made for Cast & Crew Production Payroll, Inc., clients of Alan Brunswick, an attorney later retained by HCL to ensure that it was in compliance with the California Labor Code. Mr. Brunswick was a signatory to the | Harris Decl., ¶ 16; Pl. Ex. 20, 5:5 – 6:4; Pl. Ex. 30. |

| | |
|---|---|
| Settlement Agreement and was well aware of concept that the production company employer's name should be included on a paystub issued by a payroll company. | |
| 82. In <u>Dianda v. PDEI, Inc.</u>, Central District of California, Case No. CV 08-1220-VBF (FFMx), a nearly identical case decided by this Court, a crewmember alleged that a production company (Reactor Films) and the payroll company (PDEI, Inc.) acted as his "joint employers." Dianda alleged five causes of action, including violations of Labor Code sections 203, 226, 510, 1194, as well as section 206 of the FLSA. The Court granted summary judgment in favor of the payroll company, PDEI, "finding that no reasonable trier of fact would find that Defendant PDEI, Inc. is the 'employer' of Plaintiff." In <u>Dianda</u>, this Court found that PDEI was not even a "joint employer" under the less stringent definition of the FLSA. <br><br>The FLSA applies to "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). As in <u>Dianda</u>, it would appear that the defense cannot establish that a "joint employer" relationship exists under the "economic reality" of the employment situation. <u>Gilbreath v. Cutter Biological, Inc.</u>, 931 F.2d 1320, 1324 (9th Cir. 1991). As this Court previously recognized: <br><br>The Ninth Circuit has identified four | Pl. Ex. 28, p. 2. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| | |
|---|---|
| factors to consider in making this determination:  whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of  payment, and (4) maintained employment records.  Id. However, these particular factors are merely guidelines; they are not etched in stone and will not be blindly applied.  The determination of whether an employer-employee relationship exists does not depend on isolated factors but rather upon the circumstances of the whole activity. Id. (internal citations and quotations omitted).  While this determination is based upon certain factual issues, the ultimate question of whether an employer/employee relationship exists is a question of law.  See Bonnette v. California Health and Welfare Agency, 704 F.2d 1465, 1469 (9th Cir. 1983). | |
| 83. PAV does not appear to have determined the method | Pl. Ex. 19, 9:3-4. |

| | |
|---|---|
| and rate of payment of wages, as "crew rate was determined either by union contracts or by department heads in consultation with the line producer and UPM," both of whom were HCL employees. | |
| 84.<br><br>In <u>Serino v. Payday California, Inc.</u>, Central District of California Case No. CV 07-05029-VBF (FFMx), the result was that the payroll company, Payday California, Inc., was not and could not be an "employer" of crewmembers on a production. This result was reached despite the fact the senior payroll coordinator had confirmed, under oath, that the crewmembers were the payroll company's employees. | Pl. Ex. 29, p. 5-6. |
| 85.<br><br>HCL has never, until the filing of this Motion, alleged that PAV was an "employer" of Plaintiffs. HCL failed to allege that PAV or any other entity was the employer in its Answer to the Complaint. Further, when asked to identify each person with knowledge of the facts set forth in Bart Barber's Complaint," HCL failed to identify even one person from PAV. | Pl. Ex. 13-11, 13-12. |
| 86.<br><br>In response to the interrogatory, "IDENTIFY the PERSON or PERSONS in your organization (including outside accountants, consultants, and/or attorneys) who were responsible for your compliance with the California Labor Code," HCL did not identify one individual from PAV. | Pl. Ex. 13-06. |

Labor Code § 226(a)

| Plaintiffs Additional Uncontroverted Facts | Plaintiff's Evidence |
|---|---|
| 19.<br><br>Plaintiff Bart Barber and the Opt-In Collective Action Members are ten members of the crew who worked on the production of the motion picture *The Human Contract*. | Barber Decl., ¶ 2-3;<br>Bernstein Decl., ¶ 2-3;<br>Bracken Decl., ¶ 2-3;<br>Buehrle Decl., ¶ 2-3;<br>Davis Decl., ¶ 2-3;<br>Goyer Decl., ¶ 2-3;<br>Nisar Decl., ¶ 2-3;<br>Turner Decl., ¶ 2-3;<br>Wade Decl., ¶ 2-3;<br>Wayton Decl., ¶ 2-3. |
| 20.<br><br>Plaintiffs' claims arise out of the fact that none received his or her final wages for more than 50 days after being discharged, and were not provided proper wage statements. | Barber Decl., ¶ 6, 10;<br>Bernstein Decl., ¶ 5-7;<br>Bracken Decl., ¶ 6-8;<br>Buehrle Decl., ¶ 6, 8;<br>Davis Decl., ¶ 6, 9-10;<br>Goyer Decl., ¶ 4-6;<br>Nisar Decl., ¶ 5-8;<br>Turner Decl., ¶ 4, 6;<br>Wade Decl., ¶ 4, 6-8;<br>Wayton Decl., ¶ 4, 6-8. |
| 21.<br><br>All the crew on *The Human Contract* – including | Pl. Ex. 19, 5:9-11. |

| | |
|---|---|
| Plaintiffs – entered into written employment contracts with Human Contract LLC. | |
| 22.<br><br>Human Contract, LLC is the entity that entered Collective Bargaining Agreements ("CBA's") with various unions for the making of *The Human Contract*. | Pl. Ex. 19, 6:1 |
| 23.<br><br>Human Contract, LLC had the power to fire crewmembers. | Pl. Ex. 19, 6:4-6. |
| 24.<br><br>Plaintiffs were supervised by the line producer, the unit production manager, and department heads. | Pl. Ex. 19, 14:6-8. |
| 25.<br><br>The line producer, unit production manager, and department heads were all employees of Human Contract LLC. | Pl. Ex. 19, 14:6-8. |
| 26.<br><br>It was Human Contract, LLC that was responsible for day-to-day supervision of crew members such as Plaintiffs. | Pl. Ex. 19, 6:1 – 7:10. |
| 27.<br><br>It was Human Contract, LLC who had the power to fire crewmembers. | Pl. Ex. 19, 6:6. |
| 28.<br><br>The department heads, the first assistant director, the second assistant director, the crew, the unit production manager, and the line producer all had contractual employment agreements with Human Contract, LLC. | Pl. Ex. 19, 8:18-23. |

| | |
|---|---|
| 29.<br><br>Crew rate of pay was determined either by union contracts or by department heads in consultation with the line producer and UPN. | Pl. Ex. 19, 9:3-4. |
| 30.<br><br>The budget, which includes estimates for crew labor, was prepared by the line producer, unit production manager, and production accountant, all three of whom were employed by Human Contract, LLC. | Pl. Ex. 19, 9:7-9. |
| 31.<br><br>HCL was the Plaintiffs' "sole" employer. | Pl. Ex. 13, p. 5:12-18;<br>Pl. Ex. 19, 5:7-11. |
| 32.<br><br>Human Contract, LLC's production accountant, production legal department, and production coordinator (and then, after production was completed, the post-production accountant) maintained crew employment records, and many of those records were produced in discovery as Exhibits HC394-775. | Pl. Ex. 19, 9:14-17. |
| 33.<br><br>Human Contract, LLC is a limited liability company with two members, which was created to produce *The Human Contract*. | Pl. Ex. 19, 4:8-10. |
| 34.<br><br>PAV Film Services, Inc., was a payroll company chosen and utilized by Human Contract, LLC to process payroll for each of the Plaintiffs and other crewmembers on Production. | Pl. Ex. 19, 9:10-13;<br>Pl. Ex. 1-11. |
| 35. | Pl. Ex. 1-11. |

| | |
|---|---|
| The PAV Film Services wage statements identified PAV as the sole employer of the Plaintiffs. | |
| 36.<br><br>HCL utilized the services of several attorneys including Alan Brunswick, "compliance with the California Labor Code" and who was well versed in the requirements of section 226. | Harris Decl., ¶ 16,<br><br>Pl. Ex. 20, p. 5:5 – 6:4. |
| 37.<br><br>Other than on the production of *The Human Contract*, PAV's regular practice was to provide crewmembers with the name of the production company employer on its paystubs. | Harris Decl., ¶ 12. |
| 38.<br><br>Each of the Plaintiffs regularly received paystubs that had the name and address of their production company employer on the paystub, although no such information was provided on the paystubs issued by PAV on behalf of Human Contract, LLC. | Barber Decl., ¶ 10;<br><br>Bernstein Decl., ¶ 6-7;<br><br>Bracken Decl., ¶ 7-8;<br><br>Buehrle Decl., ¶ 8;<br><br>Davis Decl., ¶ 9-10;<br><br>Goyer Decl., ¶ 5-6;<br><br>Nisar Decl., ¶ 7-8;<br><br>Turner Decl., ¶ 6;<br><br>Wade Decl., ¶ 6-8;<br><br>Wayton Decl., ¶ 6-8. |
| 39.<br><br>On February 1, 2008, Alison Cohen, Human Contract, LLC's production attorney, was sent an email from Film Finances, Inc., stating, in pertinent part that Human Contract, LLC should "determine[] their legal responsibility to repay [the employees] in light of the | Pl. Ex., 21-04. |

| | |
|---|---|
| axium bankruptcy." | |
| 40.<br><br>On February 4, 2008, Human Contract, LLC communicated with Film Finances, Inc., the Production's bonding company, whether Human Contract, LLC might pay its employees from the 10% contingency funds that had already been put aside, or from some other source. | Pl. Ex., 21-01. |
| 41.<br><br>On or before January 16, 2008, all Plaintiffs had notified a representative of Human Contract, LLC that their respective paychecks were not negotiable. | Barber Decl., ¶ 6;<br>Bernstein Decl., ¶ 5;<br>Bracken Decl., ¶ 6;<br>Buehrle Decl., ¶ 6;<br>Davis Decl., ¶ 6;<br>Goyer Decl., ¶ 4;<br>Nisar Decl., ¶ 5;<br>Turner Decl., ¶ 4;<br>Wade Decl., ¶ 4;<br>Wayton Decl., ¶ 4. |
| 42.<br><br>Human Contract, LLC claims that it did not immediately provide final payment of wages to Plaintiffs was due to the fact that, "there was no money in the film's budget to pay a second time wages of those employees who did not deposit their checks when they received them . . . [and] Human Contract, LLC needed to obtain approval from the bonding company to use the contingency to repay the wages a second time." | Pl. Ex. 18, 2:19-24 |

| | |
|---|---|
| 45.<br><br>Human Contract, LLC did not make payment of Plaintiffs' final wages available to them until February 19, 2008. | Pl. Ex., 16-4:11-25. |
| 46.<br><br>Each Plaintiff was confused and injured on account of the fact that Human Contract, LLC provided wage statements that did not include the name and address of the employer.  For example, according to Barber:<br><br>"Those paystubs were confusing to me, insofar as they did not reveal the name and address of my legal employer. I previously believed that Overbrook was in fact my employer.  Under state law, I understand that I was entitled to this information, and believe I was injured on account of the fact that the wage statements did not provide the information in clear fashion. For example, this action was originally brought against Overbrook Entertainment as well as Human Contract, LLC, because I believed they were both my employers.  I have now learned that the Court has ruled, on May 5, 2010, that Overbrook was not my employer.  Had I known this before, legal action would not have been brought against Overbrook, alleging they were my employer." | Barber Decl., ¶ 10;<br>Bernstein Decl., ¶ 6-7;<br>Bracken Decl., ¶ 7-8;<br>Buehrle Decl., ¶ 8;<br>Davis Decl., ¶ 9-10;<br>Goyer Decl., ¶ 5-6;<br>Nisar Decl., ¶ 7-8;<br>Turner Decl., ¶ 6;<br>Wade Decl., ¶ 6-8;<br>Wayton Decl., ¶ 6-8. |
| 47.<br><br>Those document which are included in Exhibits 1-12, | Pl. Ex. 1-12, 21, 22.<br>Harris Decl. ¶ ¶ 2, 6-7. |

| | |
|---|---|
| 21, &22 to Plaintiff Evidence in Support of Motion for Summary Judgment, and are Bates stamped by HCL as HC0001-867, are true and accurate copies of documents produced by Human Contract, LLC in response to Requests for Production, propounded by Plaintiff Bart Barber in this action. | |
| 49.<br><br>The paychecks HCL tendered in late February of 2008 to each of the Plaintiffs claim to be "invoices" to "vendors" and fail to provide any information regarding the "gross wages earned" (section 226(a)(1)); "total hours worked" (section 226(a)(2)); "all deductions" (section 226(a)(4)); "inclusive dates of the period for which the employee is paid" (section 226(a)(6)); four digits from a social security number or an employee identification number (section 226(a)(7)); or "all applicable hourly rates in effect . . . and the corresponding number of hours worked at each hourly rate" (section 226(a)(9)). | Pl. Ex. 12. |
| 51.<br><br>Exhibit 24 to Plaintiffs Evidence is a true and accurate copy of an email sent on behalf of Human Contract, LLC on or about February 15, 2008, which was produced by HCL in discovery. | Harris Decl., ¶ 9;<br>Pl. Ex. 24. |
| 52.<br><br>The Defendant cannot establish that PAV Film Services (Axium) was Plaintiffs' employer. HCL provided payroll funds to Axium before each payroll | Harris Decl., Ex. 27;<br>Pl. Ex. 27, 28, 29. |

| | |
|---|---|
| period and Axium cut checks to the employees. Those checks contained paystubs which listed, among other information, the name of Axium's affiliate (PAV) and that affiliate's address. | |
| 55.<br><br>This Court has previously determined that entertainment payroll companies like Axium are not an employer of crewmembers in the entertainment industry. | Harris Decl., ¶ 13-14.<br>Pl. Ex. 28-29. |
| 56.<br><br>The wage statement issued to Plaintiffs from PAV Film Services (an affiliate of Avalon /Axium) did not specify that Human Contract LLC was Plaintiffs' employer, despite the fact that this information, and in fact this information is required by the California Labor Code. | Barber Decl., ¶ 10;<br>Bernstein Decl., ¶ 6-7;<br>Bracken Decl., ¶ 7-8;<br>Buehrle Decl., ¶ 8;<br>Davis Decl., ¶ 9-10;<br>Goyer Decl., ¶ 5-6;<br>Nisar Decl., ¶ 7-8;<br>Turner Decl., ¶ 6;<br>Wade Decl., ¶ 6-8;<br>Wayton Decl., ¶ 6-8.<br>Cal. Lab. Code § 226. |
| 57.<br><br>Each of the Plaintiffs regularly received paystubs that had the name and address of their production company employer on the paystub, although no such information was provided on the paystubs issued by PAV on behalf of Human Contract, LLC. | Barber Decl., ¶ 10;<br>Bernstein Decl., ¶ 6-7;<br>Bracken Decl., ¶ 7-8;<br>Buehrle Decl., ¶ 8;<br>Davis Decl., ¶ 9-10;<br>Goyer Decl., ¶ 5-6;<br>Nisar Decl., ¶ 7-8;<br>Turner Decl., ¶ 6; |

| | |
|---|---|
| | Wade Decl., ¶ 6-8; |
| | Wayton Decl., ¶ 6-8. |
| 64. <br><br> Human Contract, LLC did not make Plaintiffs' final wages available to them until February 19, 2008. | Pl. Ex., 16-4:11-25. |
| 65. <br><br> Each Plaintiff was confused and injured on account of the fact that Human Contract, LLC provided wage statements that did not include the name and address of the employer.  For example, according to Barber: <br><br>      "Those paystubs were confusing to me, insofar as they did not reveal the name and address of my legal employer. I previously believed that Overbrook was in fact my employer.  Under state law, I understand that I was entitled to this information, and believe I was injured on account of the fact that the wage statements did not provide the information in clear fashion. For example, this action was originally brought against Overbrook Entertainment as well as Human Contract, LLC, because I believed they were both my employers.  I have now learned that the Court has ruled, on May 5, 2010, that Overbrook was not my employer.  Had I known this before, legal action would not have been brought against Overbrook, alleging they were my employer." | Barber Decl., ¶ 10; <br> Bernstein Decl., ¶ 6-7; <br> Bracken Decl., ¶ 7-8; <br> Buehrle Decl., ¶ 8; <br> Davis Decl., ¶ 9-10; <br> Goyer Decl., ¶ 5-6; <br> Nisar Decl., ¶ 7-8; <br> Turner Decl., ¶ 6; <br> Wade Decl., ¶ 6-8; <br> Wayton Decl., ¶ 6-8. |
| 66. | Pl. Ex. 1-12, 21, 22. |

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS

| | |
|---|---|
| Those documents which are included in Exhibits 1-12, 21, &22 to Plaintiff Evidence in Support of Motion for Summary Judgment, and are Bates stamped by HCL as HC0001-867, are true and accurate copies of documents produced by Human Contract, LLC in response to Requests for Production, propounded by Plaintiff Bart Barber in this action. | Harris Decl. ¶ ¶ 2, 6-7. |
| 67.<br><br>The paychecks HCL tendered in late February of 2008 to each of the Plaintiffs claim to be "invoices" to "vendors" and fail to provide any information regarding the "gross wages earned" (section 226(a)(1)); "total hours worked" (section 226(a)(2)); "all deductions" (section 226(a)(4)); "inclusive dates of the period for which the employee is paid" (section 226(a)(6)); four digits from a social security number or an employee identification number (section 226(a)(7)); or "all applicable hourly rates in effect . . . and the corresponding number of hours worked at each hourly rate" (section 226(a)(9)). | Pl. Ex. 12. |
| 81.<br><br>A Settlement Agreement was entered by and between all of the major studios and payroll companies (including Axium) in *Greenberg v. E.P. Management Services, LP, et al*, Los Angeles Superior Court Case No. BC 237787.  This Agreement settled the litigation referenced in the foregoing legislative history.  Alan Harris represented the plaintiff classes in *Greenberg*, | Harris Decl., ¶ 16; Pl. Ex. 20, 5:5 – 6:4; Pl. Ex. 30. |

and is familiar with that litigation, the Settlement Agreement, and the subsequent legislation. There was no contention in the litigation regarding whether one could or could not consider an employee to be paid in derogation of the requirements of section 212 of the California Labor Code, requiring that the checking account be funded for at least thirty days. The amendment to the legislation was not intended to permit an employer to "pay" an employee in derogation of section 212 of the Labor Code. The intent was to fix a date from which continuing wages might be deemed to accrue. Further, details concerning the requirements of section 226 of the Labor Code were extensively covered in the settlement agreement, with special provisions made for Cast & Crew Production Payroll, Inc., clients of Alan Brunswick, an attorney later retained by HCL to ensure that it was in compliance with the California Labor Code. Mr. Brunswick was a signatory to the Settlement Agreement and was well aware of concept that the production company employer's name should be included on a paystub issued by a payroll company.

82.

In Dianda v. PDEI, Inc., Central District of California, Case No. CV 08-1220-VBF (FFMx), a nearly identical case decided by this Court, a crewmember alleged that a production company (Reactor Films) and the payroll company (PDEI, Inc.) acted as his "joint employers."

Pl. Ex. 28, p. 2.

Dianda alleged five causes of action, including violations of Labor Code sections 203, 226, 510, 1194, as well as section 206 of the FLSA. The Court granted summary judgment in favor of the payroll company, PDEI, "finding that no reasonable trier of fact would find that Defendant PDEI, Inc. is the 'employer' of Plaintiff." In <u>Dianda</u>, this Court found that PDEI was not even a "joint employer" under the less stringent definition of the FLSA.

The FLSA applies to "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). As in <u>Dianda</u>, it would appear that the defense cannot establish that a "joint employer" relationship exists under the "economic reality" of the employment situation. <u>Gilbreath v. Cutter Biological, Inc.</u>, 931 F.2d 1320, 1324 (9th Cir. 1991). As this Court previously recognized:

The Ninth Circuit has identified four factors to consider in making this determination: whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. <u>Id.</u>

| | |
|---|---|
| However, these particular factors are merely guidelines; they are not etched in stone and will not be blindly applied. The determination of whether an employer-employee relationship exists does not depend on isolated factors but rather upon the circumstances of the whole activity. <u>Id.</u> (internal citations and quotations omitted). While this determination is based upon certain factual issues, the ultimate question of whether an employer/employee relationship exists is a question of law. <u>See Bonnette v. California Health and Welfare Agency</u>, 704 F.2d 1465, 1469 (9th Cir. 1983). | |
| 83. PAV does not appear to have determined the method and rate of payment of wages, as "crew rate was determined either by union contracts or by department heads in consultation with the line producer and UPM," both of whom were HCL employees. | Pl. Ex. 19, 9:3-4. |
| 84. In <u>Serino v. Payday California, Inc.,</u> Central District of California Case No. CV 07-05029-VBF (FFMx), the result was that the payroll company, Payday California, Inc., was not and could not be an | Pl. Ex. 29, p. 5-6. |

| | |
|---|---|
| "employer" of crewmembers on a production. This result was reached despite the fact the senior payroll coordinator had confirmed, under oath, that the crewmembers were the payroll company's employees. | |
| 85.<br><br>HCL has never, until the filing of this Motion, alleged that PAV was an "employer" of Plaintiffs. HCL failed to allege that PAV or any other entity was the employer in its Answer to the Complaint. Further, when asked to identify each person with knowledge of the facts set forth in Bart Barber's Complaint," HCL failed to identify even one person from PAV. | Pl. Ex. 13-11, 13-12. |
| 86.<br><br>In response to the interrogatory, "IDENTIFY the PERSON or PERSONS in your organization (including outside accountants, consultants, and/or attorneys) who were responsible for your compliance with the California Labor Code," HCL did not identify one individual from PAV. | Pl. Ex. 13-06. |

Dated:  May 25, 2010                  Harris & Ruble

                                        _____/s/_____

                                        Alan Harris
                                        Matthew E. Kavanaugh
                                        Attorneys for Plaintiff

PLAINTIFF'S RESPONSE TO DEFENDANT HCL'S UNCONTROVERTED FACTS
AND PLAINTIFF'S ADDITIONAL UNCONTROVERTED FACTS